No. 15-35018, 15-35179

---

IN THE UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

ANTHONY PATRICK REED,
Plaintiff-Appellant,
v.

DOUG LIEURANCE, in his individual capacity; BRIAN GOOTKIN, in his
individual capacity; GALLATIN COUNTY SHERIFF'S OFFICE, a department of
Gallatin County, and GALLATIN COUNTY,
Defendants-Appellees.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HON. SAM E. HADDON

---

**APPELLANT'S OPENING BRIEF**

---

Rebecca K. Smith
PUBLIC INTEREST DEFENSE CENTER, PC
P.O. Box 7584
Missoula, MT 59807
(406) 531-8133

Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC
P.O. Box 7051
Missoula, MT 59807
(406) 721-1435

Attorneys for Appellant

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.  STATEMENT REGARDING ADDENDUM. . . . . . . . . . . . . . . . . . . . . . . 2

V.  STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.  RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           1.  May 23, 2012 Events. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

           2.  Post-arrest events. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           3.  Lack of training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

           4.  Expert findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      B.  PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      C.  RULINGS PRESENTED FOR REVIEW. . . . . . . . . . . . . . . . . . . . 15

VI.  SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VII.  ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      A.  The district court erred by granting summary judgment to the officers. . . 18

           1.  Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

           2.  Lieurance lacked probable cause to arrest Reed for obstruction. . . 19

3.  The district court erred by granting summary judgment to
    Lieurance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

4.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.  The district court erred by dismissing  Reed's *Monell* claim and denying
    Reed's motion to amend his Complaint.. . . . . . . . . . . . . . . . . . . . . 29

1.  Standards of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2. The Sheriff's Office has failed to implement training and policy
   regarding citizens' rights to observe and document government
   conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    a.  The policy or custom of action or inaction was the moving
        force behind the constitutional violations. . . . . . . . . . . 31

    b.  The Sheriff promulgated, deliberately chose, or failed to act
        with deliberate indifference to the challenged policy or
        custom.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3.  The district court erred by dismissing Reed's *Monell* claim and
    denying leave to amend his Complaint.. . . . . . . . . . . . . . . . . 34

4.  The district court failed to comply with the summary judgment
    standard.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

5.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C.  The district court erred in excluding Reed's police practices expert.. . . 38

D.  The district court erred in granting judgment as a matter of law.. . . . . . 42

1.  Standard of review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2. Reed's claims at trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    a.  Deputy Lieurance unreasonably restricted the exercise of
        Reed's rights.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      b. Deputy Lieurance violated Reed's right to exercise his rights without government retaliation.. . . . . . . . . . . . . . . . . . 51

   3. The district court erred by granting judgment as a matter of law.. . 54

      a. The district court violated basic premises of Rule 50 and its advisory comments.. . . . . . . . . . . . . . . . . . . . . . . . . . 54

      b. The district court's decision is premised on impermissible factual findings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

   4. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

VIII. CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

STATEMENT OF RELATED CASES.. . . . . . . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

## TABLE OF AUTHORITIES

CASES

*ACLU v. Alvarez,* 679 F.3d 583 (7th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . 44

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Bank of Boston v. Bellotti,* 435 U.S. 765 (1978). . . . . . . . . . . . . . . . . . . . . . . 44

*Bates v. King County,* 2007 WL 1412889 (W.D. Wash. 2007). . . . . . . . . . . . 38, 49

*Beck v. City of Upland,* 527 F.3d 853 (9th Cir. 2008). . . . . . . . . . . . . . . . . . 20, 28

*Board of County Comm'rs of Bryan Co.. v. Brown,*
   520 U.S. 397 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 33, 34

*Bordanero v. McLeod,* 871 F.2d 1151 (1st Cir. 1989). . . . . . . . . . . . . . . . . . 31, 32

*Canton v. Harris,* 489 U.S. 378 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 34

*Chappel v. Laboratory Corporation of American,* 232 F.3d 719 (9th Cir.2000). . 29

*City of Chicago v. Morales,* 527 U.S. 41 (1999). . . . . . . . . . . . . . . . . . . . . . . . 45

*City of Houston v. Hill,* 482 U.S. 451 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . 51

*City, Utah v. Summum,* 555 U.S. 460 (2009).. . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Cortez v. Skol,* 776 F.3d 1046 (9th Cir.2015). . . . . . . . . . . . . . . . . . . . . . . . . 18, 28

*Couveau v. American Airlines, Incorporated,* 218 F.3d 1078 (9th Cir.2000).. . . . 36

*Davis v. Mason County*, 927 F.2d 1473 (9th Cir.1991). . . . . . . . . . . . . . . . . . 38, 39

*Daubert v. Merrell Dow Pharms., Incorporated,* 509 U.S. 579 (1993). . . . . . . . . 38

iv

*Dietrich v. John Ascuaga's Nugget,* 548 F.3d 892 (9th Cir. 2008). . . . . . . . . 46, 47

*Dorwart v. Caraway,* 2002 MT 240. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

*Duran v. City of Douglas,* 904 F.2d 1372 (9th Cir.1990).. . . . . . . . . . 15, 30, 52, 58

*Eminence Capital, LLC v. Aspeon, Inc.* 316 F.3d 1048 (9th Cir.2003). . . . . . . . . 36

*Farmer v. Brennan,* 511 U.S. 825 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Florida v. Royer,* 460 U.S. 491 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 31

*Ford v. City of Yakima,* 706 F.3d 1188 (9th Cir.2013).. . . . . . . . . . . . . . . . passim

*Foman v. Davis*, 371 U.S. 178 (1962). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Fordyce v. City of Seattle,* 55 F.3d 436 (9th Cir.1995). . . . . . . . . . . . . . . . . . . . 44

*Frisby v. Schultz,* 487 U.S. 474 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Furnace v. Sullivan,* 705 F.3d 1021 (9th Cir.2013). . . . . . . . . . . . . . . . . . . . 19, 28

*Gard v. United States,* 594 F.2d 1230 (9th Cir.1979). . . . . . . . . . . . . . . . . . . . . 28

*Gathright v. City of Portland,* 439 F.3d 573 (9th Cir. 2006). . . . . . . . . . . . . . . . 47

*Glik v. Cunliffe,* 655 F.3d 78 (1st Cir.2011). . . . . . . . . . . . . . . . . . . . . . 15, 44, 45

*Groves v. Croft,* 2011 WL 5509028 (D.Mont. 2011).. . . . . . . . . . . . . . . . . . . . . 38

*Hangarter v. Provident Life and Accident Insurance Company,*

    373 F.3d 998 (9th Cir.2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Iacobucci v. Boulter,* 193 F.3d 14 (1st Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . 25

*Jackson v. Johnson,* 797 F. Supp.2d 1057 (D.Mont.2011).. . . . . . . . . . . . . . . . . 25

v

*Kalispell,* 2002 MT 78. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 28

*Kennedy v. Collagen Corp.,* 161 F.3d 1226 (9th Cir.1998). . . . . . . . . . . . . . . . . 42

*Kleindienst v. Mandel,* 408 U.S. 753 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Kuba v. 1-A Agr. Association ,* 387 F.3d 850 (9th Cir. 2004). . . . . . . . . . . . passim

*Kumho Tire Company v. Carmichael,* 526 U.S. 137 (1999). . . . . . . . . . . . . . . . 38

*LaLonde v. County of Riverside,* 204 F.3d 947 (9th Cir.2000).. . . . . . . . . 42, 56, 59

*Lacey v. Maricopa Cnty,* 693 F.3d 896 (9th Cir.2012). . . . . . . . . . . . . . . . . . . . . 36

*Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir.1991). . . . . . . . . . . . . . . . . 38

*Lee v. Los Angeles,* 250 F.3d 668 (9th Cir.2001).. . . . . . . . . . . . . . . . . . . . . . . . 35

*Leigh v. Salazar,* 954 F.Supp.2d 1090 (D.Nev.2013). . . . . . . . . . . . . . . . . . 50, 51

*Mackinney v. Nielsen*, 69 F.3d 1002 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . 21

*Maxwell v. County of San Diego*, 708 F.3d 1075 (9th Cir.2013). . . . . . . . . . . . . . 21

*McCullen v. Coakley,* 134 Southern Ct. 2518 (2014).. . . . . . . . . . . . . . . . . . . 46, 47

*Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978).. . . . 30

*Norwell v. City of Cincinnati, Ohio,* 414 U.S. 1416 (1973). . . . . . . . . . . . . . . . . 52

*Polich v. Burlington Northern, Inc.* 942 F.2d 1467 (9th Cir.1991). . . . . . . . . 30, 36

*Public Service Commission of New York,* 447 U.S. 530 (1980). . . . . . . . . . . . . . 48

*Pyramid Technologies, Incorporated v. Hartford Casualty Insurance Company,* 752 F.3d 807 (9th Cir.2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Reeves v. Sanderson Plumbing Products,* 530 U.S. 133 (2000)......... 42, 43, 56

*Richmond Newspapers,* 448 U.S. 578.................................. 45

*Robinson v. Fetterman*, 378 F. Supp. 2d 534 (E.D.Pa.2005)................. 50

*Shuttlesworth v. City of Birmingham,* 394 U.S. 147 (1969)................. 22

*Smith v. City of Cumming,* 212 F.3d 1332 (11th Cir.2000). ........... 44, 60, 61

*State v. Johnston,* 2010 MT 152....................................... 21

*State v. Thornton,* 218 Mont. 317 (1985). .............................. 20

*State v. Williamson,* 1998 MT 199. .................................... 19

*Sullivan v. U.S. Department of Navy,* 365 F.3d 827 (9th Cir.2004)............ 38

*Summers v. Delta Air Lines,* 508 F.3d 923 (9th Cir.2007)............. 43, 54, 55

*Tolan v. Cotton,* 134 S.Ct. 1861 (2014)................................. passim

*Torres v. City of Los Angeles,* 548 F.3d 1197 (9th Cir. 2008). ............... 42

*Torres v. City of Madera,* 648 F.3d 1119 (9th Cir.2011)................. 19, 28

*U.S. v. Fei Ye,* 436 F.3d 1117 (9th Cir. 2006). ....................... 29, 59

*U.S. v. Nguyen,* 262 F.3d 998 (9th Cir. 2001). .......................... 35

*U.S. v. Paul,* 561 F.3d 970 (9th Cir.2009). ............................. 60

*Velazquez v. City of Long Beach,*

    --- F.3d ----, 2015 WL 4256899 (9th Cir. 2015)............... 42, 56, 59, 60

*Ward v. San Diego County,* 791 F.2d 1329 (9th Cir. 1986)................. 30

vii

*Waters v. Young,* 100 F.3d 1437 (9th Cir.1996).. . . . . . . . . . . . . . . . . . . . . . . 43, 54

*Wilson v. Kittoe*, 337 F.3d 392 (4th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Zellner v. Summerlin,* 494 F.3d 344 (2nd Cir.2007). . . . . . . . . . . . . . . . . . . . 22, 26

STATUTES

42 U.S.C. §1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Mont. Code Ann. §45-1-104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Mont. Code Ann. §45-7-302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONSTITUTIONAL PROVISIONS

Mont. Const. art. II, §§6,7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Mont. Const. art. II,§§10,11. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

U.S. Const. amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

viii

# I.  INTRODUCTION

This case is a civil rights action under 42 U.S.C. §1983 and the U.S. and Montana Constitutions.  Plaintiff-Appellant Anthony Patrick Reed (Reed) asserts that Defendants-Appellees (collectively "officers") violated his constitutional rights to freedom from unreasonable seizure, privacy, and freedom of speech, press, and assembly when Reed attempted to observe and document a government operation in a public area from a safe distance, and Reed was arrested for "obstruction," and evicted from the area under the threat of incarceration and more citations.

As set forth below, the district court granted summary judgment or judgment as a matter of law for the officers on all of Reed's claims, but the district court failed to apply the relevant case law and failed to view the facts in the light most favorable to Reed as required.  Therefore, for the reasons set forth below, Reed respectfully requests that this Court reverse the district court and either enter judgment against the officers or remand for a full trial and determination by a jury on all claims.

# II.  JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §1331because this is an action involving federal law 42 U.S.C. §1983.  This Court has jurisdiction over this appeal under 28 U.S.C. §1291 by virtue of the district court's entry of final judgment on January 8, 2015.  ER1.  Reed filed his notice of appeal on January 8,

2015.  ER49.  Therefore, this appeal is timely.  FRAP 4(a)(1)(B).

## III.  STATEMENT OF THE ISSUES

A.  Whether the district court erred by granting summary judgment to the officers regarding the issue of unreasonable seizure and violation of privacy; and

B.  Whether the district court erred by dismissing Reed's *Monell* claim and denying Reed's motion to amend his Complaint to add specificity to that claim; and

C.  Whether the district court erred by excluding Reed's police practices expert, Charlottesville, Virginia Police Chief Timothy Longo; and

D.  Whether the district court erred by granting judgment as a matter of law to the officers on the free speech, press, and assembly claims.

## IV.  STATEMENT REGARDING ADDENDUM

Pursuant to Ninth Circuit FRAP 28-2.7, an addendum is attached to this brief.

## V.  STATEMENT OF THE CASE

## A.  RELEVANT FACTS

On May 23, 2012, Reed was arrested and cited for obstruction while volunteering with the Buffalo Field Campaign (Campaign), a 501(c)(3) non-profit conservation organization.  Reed was attempting to peacefully observe and document, from a safe distance, a government operation herding Yellowstone buffalo from a National Forest into Yellowstone National Park.  ER149-158,174-

2

184.

These Yellowstone buffalo herding operations occur every year beginning as early as December and ending as late as July, and may occur as often as four or five times per week. ER97,99. In order to herd the buffalo from one area to another, the government may use horseback riders, cars, all terrain vehicles, snowmobiles, and helicopters. ER109. The buffalo travel at the pace they are driven by the herders, similar to herding cows. ER153. The government herders "wear cowboy hats, carry lassos, and make cowboy noises" while herding the buffalo. ER153. The five state and federal government agencies involved in buffalo management operations spend approximately $5 million per year on these operations, which is all paid by the federal taxpayer. ER110-111.

The Campaign is the primary media source for information about the herding operations; its footage and information are used by news outlets as well as government agencies. ER55. Volunteers come to the Campaign from all over the world to observe Yellowstone buffalo, and the Campaign trains them "to video record bison and government officers to use that footage for dissemination to news organizations and the public at large." ER152.

Approximately two weeks prior to Reed's arrest, on May 11, 2012, information collected by Campaign volunteers was submitted as key eye-witness evidence in an environmental lawsuit in federal district court in the District of

3

Montana challenging the use of helicopters in the herding operations as unlawful. ER437-446.  On May 14, 2012, the district court in that case granted a temporary restraining order against the use of helicopters during buffalo herding operations. ER424-425.  Helicopters make it easier to herd the buffalo, ER109, but on the date of Reed's arrest, the government was not able to use helicopters due to the court injunction, ER424-425.  Reed believes that on the day of his arrest: "I may have been the low-hanging fruit . . . ."  ER151.  In the arrest report, Reed is characterized as a "Protestor" associated with the Campaign.  ER415.

Reed's arrest incident was captured in part on a video recording by his field partner Kasi Craddock-Crocker, ER420 (Trial Exhibit 1), and in part on an audio recording by the arresting officer, Deputy Doug Lieurance, ER421 (Trial Exhibit 2). Additional video footage was also taken by Campaign volunteers that day.  ER422 (Trial Exhibit 12) at 14:30.

### 1.  May 23, 2012 Events

On May 23, 2012, Reed and Craddock-Crocker had first driven to the herding operation at its location on Madison Arm Road west of Highway 191. ER53,158.  They were unable to obtain the footage they desired at that location so they left the herding operation, drove east on Madison Arm Road, crossed Highway 191, and parked opposite Madison Arm Road near the junction of Highway 191 and Conservation Lane, which is denoted as Location A on the map.  ER53-58,82,

161,176,185B.



While they were parked at Location A, Montana Department of Livestock

agent Rob Tierney approached their vehicle.   Reed recalls that Tierney told them to

move north or south because the livestock agents were going to herd the buffalo

across the highway at that location.  ER55,162,176.  Craddock-Crocker recalls the

same.  ER83; Ex.1: 1:32,3:13.

After Tierney spoke to them, Reed and Craddock-Crocker "discussed for a second, and then [they] decided that north would be the best place. It was far out of the way. [They] found a place that was off of the road that [they] could park, and so [they] drove up there to observe the operation."  ER55-56,83.  More specifically, Reed drove the vehicle 0.60 miles north of Conservation Lane and parked on a public gravel road parallel to Highway 191, but separated by a grass median.  This location is denoted on the map as Location B.  ER56,58,113,176-177,185B.  Reed was not blocking any traffic on that gravel road.  ER296.

At the time that Reed parked at Location B, no buffalo or any part of the buffalo herding operation was within his field of vision.  ER59,61,179,182-183.  Reed's contemporaneous belief was that the operation was over one mile away from him at that time, at Location D, which is not on the map.  ER182-183; Ex.1: 0:50.  Craddock-Crocker and Reed also had a contemporaneous belief that the herding operation would not be traveling north on Highway 191 towards their location at Location B any time.  Ex.1: 3:30.  Based on his prior experiences and his earlier discussion with livestock agent Tierney, Reed believed the herding operation would travel east on Madison Arm Road, cross Highway 191, and continue east on Conservation Lane towards Yellowstone National Park.  ER54-55,175.  This herding route is denoted on the map with dashed  arrows.  ER176,185B.  Using this

6

route, the highway crossing was 0.60 miles south of Location B.  ER177,185B.

Reed "wasn't trying to protest anything.  [He] was just simply trying to observe a government operation from a safe distance."  ER65.  Reed's intent was "to observe the crossing so that [they] could share the information with the rest of the world and let them know what's happening with these animals."  ER174-175.

After Reed parked his vehicle at Location B, Deputy Lieurance drove his vehicle to Reed's location.  ER56.  Lieurance approached Reed, who was sitting in the parked vehicle, and they had the following conversation:

> LIEURANCE: "Okay, why did you come here when Rob Tierney told you to come either that side of him or this side of me?
>
> REED: "I'm not interfering with the haze."
>
> LIEURANCE: "You were instructed by an officer to go to a certain specific area and obviously you know it's a safety issue. We don't want anybody to. . . ."
>
> REED: "I'm not breaking any law being here."
>
> LIEURANCE: "You are when you've been instructed to go to a different place. So what I'm going to do . . . ."
>
> REED: "What law? What law am I breaking?"
>
> LIEURANCE: "Obstructing a governmental operation. So what we're going to do is. . . ."
>
> REED: "I am well out of the area of the haze."
>
> LIEURANCE: "You were instructed. . . ."

7

REED: "I'm not obstructing with any . . . . There are vehicles moving . . . ."

LIEURANCE: "I'm not going to argue with you."

REED: "This is selective enforcement. There are vehicles moving through here and I am being selected as a target to be pushed out of an area that other vehicles are allowed to be in."

LIEURANCE: "You've been instructed by law enforcement to do something. You didn't do it. I'm going to be writing a ticket. I'm just letting you know what's happening. I'll be right back with you in a second."

Ex.2: 0:00.

After the above conversation, Lieurance took Reed's license to his vehicle. ER165. While Reed was waiting, Reed stated to Craddock-Crocker: "no matter what his directions are . . . we're not obstructing the haze because we're nowhere even near it." Ex.1: 2:02. Likewise, Craddock-Crocker stated to livestock agent Mount on the scene: "He said to go north or south. We came north. I mean we're a mile away at least from the haze up here. They're not gonna come this way. . . . We figured this would be well out of the way since they're on the south side. . . Seems like this is well out of the way to me." Ex.1: 3:24.

Lieurance returned to Reed's vehicle to cite him for the crime of obstruction under Montana Code Annotated §45-7-302. The citation Lieurance issued to Reed states that the basis for the citation is "was told by a law enforcement officer to be in a specific place during a governmental operation 3 times and still did not

comply." ER423. After Lieurance issued the citation, the following conversation

occurred:

CRADDOCK-CROCKER: "Why are we obstructing if all these vehicles are between us right now?"

LIEURANCE: "I'm not going to argue with you right now, you just need to get in the car and go."

CRADDOCK-CROCKER: "I'm not trying to argue, I'm just asking."

LIEURANCE: "Okay, I'm not gonna talk about it right now. We're trying to do something here obviously."

REED: "What you're doing is illegal."

LIEURANCE: "I'm not gonna argue. You just need to get in the car and you need to go or I'm gonna start issuing more tickets. Or we could go to jail. I mean that's an option, I could take you to jail, now I'm not. I don't think we need to go that far."

CRADDOCK-CROCKER: "I was just trying to ask why we're being selectively enforced against, while all these people driving between."

LIEURANCE: "Because you were told to go to one location and that's . . . ."

REED: "Which is illegal. You can't just tell us if we're not obstructing."

LIEURANCE: "I'm not gonna argue. Either we get in the car and we go now, or both of you will be going to jail. That's the bottom line."

REED: "This is illegal. This is illegal."

LIEURANCE: "I'm gonna wait for you guys to leave."

REED: "What you're doing is illegal"

9

LIEURANCE: "Well you can debate that in court."

Ex.1: 17:50.

Reed then stopped attempting to discuss the issue with Lieurance and drove north from the scene due to his fear that Lieurance would take him to jail if he remained in the area and continued questioning the legal basis for his arrest. ER62,179. Reed drove 0.30 miles north to the location demanded by Lieurance, near the junction of Highway 191 and Ecology Lane. This location is denoted as Location C, which is not on the map. ER62,179-180,185B. Location C is 0.90 miles from Conservation Lane. ER176-177,179-180,290,185B.

Eventually, the herding operation traveled along Madison Arm Road, crossed Highway 191, and continued east along Conservation Lane towards Yellowstone National Park. ER101-102,175-176,185B (dashed arrows),409. If Reed would have stayed at Location B, he would have been 0.60 miles away from the operation when it crossed the highway. In other words, the operation "would have gone on fine if they would have let [Reed] alone to observe from that location." ER80. Gallatin County Sheriff Brian Gootkin admitted this fact. ER309-310.

In contrast, from Location C, Reed was unable to observe and document the buffalo herd crossing the highway because the view was completely obstructed by the curve in the highway. ER62,166. Craddock-Crocker also could not see the operation from Location C. ER88.

10

Lieurance testified that there were no buffalo, horses, or riders in his field of vision at the time he arrested Reed.  ER303.   The video of the arrest confirms that Reed was nowhere near the operation at the time of his arrest.  Ex.1.  Lieurance testified that he did not know where the operation was at the time of Reed's arrest, and he did not ask anyone where it was.  ER123,297.  Lieurance was in radio contact with the operation and could have asked for its location.  ER130-131.  Lieurance also testified that because he did not know the route for the day, he would not be able to say whether Reed's vehicle was physically blocking the route.  ER116.

Highway 191 runs south and then east into Yellowstone National Park.  ER66.  Later the same day, further along the herding route, approximately three or four miles in from the gate of Yellowstone National Park along the same road, different law enforcement officers permitted different members of the public to observe and photograph the buffalo herding operation from within 50 yards of the operation without arrest or exclusion from the area.  Ex.12: 14:13; ER63-65, 66-67.

### 2.  Post-arrest events

After receiving his citation, Reed had to make a court appearance, post bail to avoid incarceration, and hire an attorney.  ER173,184.  Reed's attorney provided the county prosecutor with a draft motion to dismiss, two witness declarations, and the arrest video.  ER380-412.  Thereafter, the prosecutor filed a motion to

11

voluntarily dismiss the obstruction charge against Reed on July 10, 2012. ER378.

The court dismissed the charge on July 11, 2012. ER377.

### 3. Lack of training

Lieurance admitted that he has not received any specific formal trainings from Gallatin County in basic First Amendment rights such as the rights to videotape in public places, be present in public places, question law enforcement officers, ignore requests by law enforcement officers, gather information, or protest government conduct. ER275-278. Lieurance testified that deputies do not receive legal update trainings on the First Amendment. ER273.

Defendants designated Gallatin County Undersheriff Daniel Springer as their 30(b)(6) representative as the individual most knowledgeable about training. Springer testified that between September 18, 2006 when Lieurance was hired and May 23, 2012, the Gallatin County Sheriff's Office did not provide any specific or documented training on freedom of speech, freedom of assembly, freedom of the press, the right to assemble on public land, or the right to observe or film public employees in the line of duty. ER193-196.

Springer further testified that he was not aware of deputies receiving legal updates or emails or written information regarding changes in First Amendment law. ER197. Springer testified that he has never been directed by the Gallatin County Sheriff to conduct training sessions on First Amendment issues or the Montana

obstruction statute.   ER198.  Springer testified that the Gallatin County Sheriff's Office assists with buffalo herding operations 10-12 times per year.  ER196.  In their discovery responses, the officers stated that they do not have any training memorandums or policies addressing the Campaign in the last five years.  ER313.

### 4.  Expert findings

Reed disclosed Charlottesville, Virginia Police Chief Tim Longo as his police practices expert.  ER202-267.  The officers did not disclose an expert to refute Chief Longo's findings.  Chief Longo finds that Gallatin County's absence of policy and training on basic First Amendment rights is inconsistent with generally accepted policing practices.  ER229.  Chief Longo described in detail the types of policies that would be consistent with generally accepted policing practices.  *See* ER228-229.  The U.S. Department of Justice (DOJ) provides similar direction to law enforcement agencies:  "policies should affirmatively state that individuals have a First Amendment right to record police officers and include examples of the places where individuals can lawfully record police activity and the types of activity that can be recorded."  ER428.

Chief Longo finds: "Based on the materials I have reviewed, I am of the opinion that the failure to train Deputy Lieurance in important and fundamental First Amendment principles led to a foreseeable risk of Constitutional harm, harm that could have well been prevented, and was inconsistent with generally accepted law

enforcement practices at the time of this incident." ER245.

B. PROCEDURAL HISTORY

Reed filed his Complaint on March 18, 2013. ER466. Both parties moved for summary judgment, and filed motions in limine, and the district court heard oral argument and ruled orally on the motions on July 23, 2014. ER467-469,27-48,24-26. The district court granted the officers' motion for summary judgment on Reed's claims that Deputy Lieurance lacked probable cause under the U.S. and Montana Constitutions. ER30-32. The district court also dismissed Reed's *Monell* claim. ER32-35. The district court granted the officers' motion to exclude Reed's expert, and partially granted Reed's motion in limine. ER35-46. Reed then filed a motion to alter judgment and a motion for leave to amend his Complaint. ER470. On October 6, 2014, the district court denied both motions. ER18-23. On December 30, 2014, the district court issued an order formally dismissing the Gallatin County Sheriff's Department and Sheriff Brian Gootkin from the case. ER17.

A jury trial in this case began on January 6, 2015 on Reed's three remaining claims, which assert that Deputy Lieurance violated Reed's rights to free speech, press, and assembly under the U.S. and Montana Constitutions, and that Deputy Lieurance retaliated against Reed for attempting to exercise his rights. After Reed rested his case on January 7, 2015, the district court solicited a Rule 50 motion from Lieurance's counsel. ER134-137. After Reed responded to the motion, the district

court read from a pre-written statement and granted judgment as a matter of law in Lieurance's favor on all remaining claims. ER2-16. The district court entered final judgment against Reed on all claims on January 8, 2015. ER1. Reed filed his appeal the same day. ER49.

## C. RULINGS PRESENTED FOR REVIEW

This appeal challenges the following rulings: (1) the district court's summary judgment ruling, (2) the district court's denial of Reed's motion to amend his Complaint, (3) the district court's exclusion of Reed's police practices expert, and (4) the district court's Rule 50 ruling.

## VI. SUMMARY OF ARGUMENT

"Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest . . . ." *Glik v. Cunliffe*, 655 F.3d 78,82-83 (1st Cir.2011)(citations and internal quotations omitted). Law enforcement officers "may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment." *Duran v. City of Douglas*, 904 F.2d 1372,1376 (9th Cir.1990). The DOJ believes that courts should view discretionary charges by law enforcement officers skeptically to ensure that individuals' First Amendment rights are protected. ER364-365.

In this case, Reed was parked on a public road – a quintessential public forum

– for the purpose of gathering information about government officials in a form that could be readily disseminated to others.  His conduct was protected by the First Amendment.  Lieurance's decision to charge Reed with a highly discretionary and vague charge, and threaten incarceration and more unspecified charges if Reed did not leave the area, violated Reed's rights to privacy, freedom from unreasonable seizure, and free speech, press, and assembly under the U.S. and Montana Constitutions.  The district court erred by dismissing Reed's claims.

First, the district court erred in granting summary judgment to the officers on the probable cause claims.  Lieurance lacked probable cause to arrest Reed because Reed's conduct does not fall within the narrowed construction of the Montana obstruction statute as set forth by the Montana Supreme Court in *Kalispell v. Cameron*.  Reed's presence in a parked vehicle over a mile away from the operation, and over ½ mile away from the route for the operation, without any intention to block the operation, does not constitute obstruction.  The district court failed to apply *Kalispell*, or any other case law, in its summary judgment opinion. In violation of the summary judgment standard, the district court also failed to view the facts and inferences in Reed's favor.

Second, the district court erred in dismissing Reed's *Monell* claim.  The district court *sua sponte* dismissed the claim on *Iqbal/Twombly* pleading specificity grounds without first providing Reed with any notice or opportunity to brief this

16

issue. When Reed moved for leave to amend his Complaint to address the court's concerns, the district court denied the motion without addressing any of the *Foman* factors, the *Polich* standard, or the liberal amendment policy under FRCP 15. Additionally, the district court failed to view facts and inferences in Reed's favor.

Third, the district court erred by excluding Reed's police practices expert. Chief Longo has decades of experience in law enforcement and is qualified to render expert testimony. His testimony is relevant and necessary for the determination of Reed's *Monell* claim. The district court's disagreement with Chief Longo's findings, or the facts upon which Chief Longo based his findings, is not an adequate ground for exclusion.

Finally, the district court erred by granting judgment as a matter of law on Reed's free speech, press, and assembly and retaliation claims. The district court failed to view the facts and inferences in the light most favorable to Reed, made credibility determinations, weighed evidence, and made factual findings that were contradicted by evidence or testimony. In so doing, the district court invaded the province of the jury. The district court also failed to cite a single case to support its ruling. Furthermore, the district court failed to give Reed an opportunity to provide additional evidence to address any asserted deficiency of proof. The district court also impermissibly ruled on issues that were not raised in Lieurance's Rule 50 motion.

17

For all of these reasons, as more fully set forth below, Reed requests that this Court reverse the district court.

## VII.  ARGUMENT

42 U.S.C. §1983 provides that "[e]very person who, under color of [state law] . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ."  Additionally, the rights at issue under the Montana Constitution are self-executing.  *Dorwart v. Caraway*, 2002 MT 240, ¶¶44-48,39.

## A.  The district court erred by granting summary judgment to the officers.

### 1.  Standard of review

This Court reviews the district court's grant of summary judgment *de novo*. *Ford v. City of Yakima*, 706 F.3d 1188,1192 (9th Cir.2013).  The Supreme Court holds:

> Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.Rule Civ.Proc. 56(a).  In making that determination, *a court must view the evidence "in the light most favorable to the opposing party*."

*Tolan v. Cotton*, 134 S.Ct. 1861,1866 (2014)(citations omitted)(emphasis added).

All  reasonable inferences must also be viewed in the light most favorable to the opposing party.  *Cortez v. Skol*, 776 F.3d 1046,1050 (9th Cir.2015).

In other words, "[i]f, as to any given material fact, evidence produced by the moving party (the officers, in this case) conflicts with evidence produced by the nonmoving party ([the plaintiff], in this case), [the court] must assume the truth of the evidence set forth by the nonmoving party with respect to that material fact." *Furnace v. Sullivan*, 705 F.3d 1021,1026 (9th Cir.2013). "Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury . . . ." *Torres v. City of Madera*, 648 F.3d 1119,1123 (9th Cir.2011)(citation and internal quotation marks omitted). "The standard on summary judgment review . . . prohibits [the court] from substituting [its] judgment concerning the weight of the evidence for the jury's." *Id.* at 1125.

### 2. Lieurance lacked probable cause to arrest Reed for obstruction.

A law enforcement officer must have probable cause to arrest. U.S. Const. amend. IV; Mont. Const. art. II,§§10,11. "Probable cause to arrest is established if the facts and circumstances within an officer's personal knowledge, or related to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that someone is committing or has committed an offense" and is "evaluated in light of a trained law enforcement officer's knowledge, taking into account all the relevant circumstances." *State v. Williamson*, 1998 MT 199 ¶12 (citations omitted).

The Montana Code states: "No conduct constitutes an offense unless it is described as an offense in this code or in another statute of this state." Mont. Code

Ann. §45-1-104(2). In this case, the only offense that Reed was arrested for was obstruction under Mont. Code Ann. §45-7-302;[1] ER423. "The misdemeanor offense, obstructing a peace officer, has these elements: (1) *knowingly*, (2) obstructs, impairs, or hinders, (3) the enforcement of the criminal law, the preservation of the peace, or the performance of a government function." *State v. Thornton*, 218 Mont. 317,325 (1985)(emphasis added).

The preeminent case on the Montana obstruction statute is *Kalispell v. Cameron*, which sets forth a narrowing construction "[t]o assure that the statute does not violate the First Amendment by sanctioning constitutionally protected challenges to police officers' activities . . . ." *See Beck v. City of Upland*, 527 F.3d 853,866 (9th Cir. 2008)(citation omitted). In *Kalispell*, the Montana Supreme Court held that merely ignoring a police officer's order does not constitute obstruction. 2002 MT 78 ¶¶4-6,12-13. The court held that the "knowingly" element is the key part of this statute and "require[s] that an individual obstructing a peace officer must engage in conduct under circumstances *that make him or her aware that it is highly probable* that such conduct will impede the performance of a peace officer's lawful duty. In other words, the City *ha[s] to prove that [the defendant] was aware that his conduct would hinder the execution* of the Officers' duties." 2002 MT 78

---

[1] A person convicted of this offense may be sentenced to 6 months in jail and be fined $500. Mont. Code Ann §45-7-302(3).

20

¶11(emphases added); *see also State v. Johnston*, 2010 MT 152 ¶¶9-14 (same holding requiring knowledge as to result). In other words, obstruction is an intentional act. Accordingly, under Montana law, "mere non-compliance with a police officer's command is not obstruction unless it is done with the knowledge that non-compliance will hinder the officer's investigation." *Jackson v. Johnson*, 797 F.Supp.2d 1057,1068 (D.Mont.2011).

This Court, and a number of other federal courts, have issued similar holdings regarding similar statutes across the country. In *Mackinney v. Nielsen*, addressing a California obstruction statute, this Court held that "[i]t is well established under California law that even 'an outright refusal to cooperate with police officers cannot create adequate grounds for [police] intrusion' without more. [] Here the officers had no grounds on which to arrest Mackinney other than his disobedience, which is insufficient . . . ." 69 F.3d at 1004,1006-1007. Likewise, in *Maxwell v. County of San Diego*, this Court held that an obstruction statute "does not make it a crime [] to resist unlawful orders." 708 F.3d 1075,1086 (9th Cir.2013).

Also directly on point, in *Wilson v. Kittoe*, the Fourth Circuit found no probable cause to arrest the plaintiff who "three times refused to obey a direct order to leave the scene." 337 F.3d 392,400 (4th Cir. 2003). The court held: "Because there was no probable cause to believe that [the plaintiff] was engaging in obstruction simply by being there . . . there could be no probable cause to believe

21

that [the plaintiff] violated the Obstruction Statute when he refused to obey [the officer's] order that he cease and leave." *Id.* at 401. Other Circuits have addressed similar issues. *See e.g. Zellner v. Summerlin*, 494 F.3d 344,376 (2nd Cir.2007)*; Wilson v. Martin* 549 Fed. Appx.309,311 (6th Cir.2013).

These cases all apply the fundamental constitutional principle that "a person approached [by a police officer] need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. []. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491,497-498 (1983)(citations omitted). Or as this Court recently held: "Where police officers have no lawful basis for stopping an individual, we held, they have no lawful basis to pursue and arrest that individual for not acceding to the investigatory stop." *Velazquez v. City of Long Beach*, --- F.3d ----, 2015 WL 4256899 at *6 (9th Cir. 2015)(citations and internal punctuation omitted).

Likewise, a person faced with an unconstitutional order to obtain permission prior to engaging in First Amendment activity "may ignore it and engage with impunity in the exercise of the right of free expression." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147,151 (1969). In sum, as the DOJ recently stated: "an individual's recording of police activity from a safe distance without any attendant

22

action intended to obstruct the activity or threaten the safety of others does not amount to interference." ER431.

Accordingly, Lieurance did not have probable cause to arrest Reed for obstruction. Reed initially parked his vehicle on a gravel road near the junction of Highway 191 and Conservation Lane (Location A). ER176,185B. Livestock agent Tierney approached Reed and asked Reed to move his vehicle north or south because Location A was where the operation was going to cross the highway. ER176. The herding operation's route is indicated on the map with dashed arrows. ER175-176,185B.

In response to Tierney's request, Reed drove his vehicle 0.60 miles north to Location B, a location on a gravel road that runs roughly parallel to, but separate from, the highway. ER176-177,185B. Location B was "the farthest away place to be out of the way, but still be able to see the crossing and get a good count on the buffalo." ER177. Reed testified that "we thought we would be well out of the way." ER178.

Lieurance arrested Reed while Reed was parked at Location B. ER179. When Reed was arrested, the operation was over one mile away from him and no buffalo or any part of the buffalo herding operation was within his field of vision or earshot. ER179,182; Ex.1: 0:50,3:26. At the time of Reed's arrest, traffic was freely flowing in both directions along the highway. ER180-181. At the time of his

23

arrest, Reed was not parked on the highway, but was parked on a gravel road that is separate from the highway. ER149,295-296. Reed was not blocking any traffic on that gravel road. ER295-296.

In Montana, obstruction does not occur unless an individual is "aware" that his conduct is "highly probable" to cause an impediment to a government operation. *Kalispell*, 2002 MT 78 ¶¶4-6,12-13. At the time of his arrest, Reed repeatedly indicated that this was not the case – he strongly believed that he was not in a location that could possibly obstruct the operation at any time:

- "I'm not interfering with the haze," Ex.2: 0:13;

- "I'm well out of the area of the haze," Ex.2: 0:34;

- "He has no right to say that I'm obstructing the haze. The haze is over a mile away right at this point," Ex.1: 0:47;

- "No matter what his directions are . . .we're not obstructing the haze because we're nowhere even near it," Ex.1: 2:02;

Lieurance conceded there were no horses, riders, or buffalo anywhere in his field of vision at the time of Reed's arrest. ER301B-303,418. Sheriff Gootkin confirmed that the location of Reed's parked vehicle would not have interrupted the operation. ER309-310. Accordingly, at the time of Reed's arrest, Lieurance did not indicate that Reed was actually physically impeding the operation in any way. Instead, Lieurance wrote on the citation that the basis of Reed's obstruction arrest

was "was told by a law enforcement officer to be in a specific place during a governmental operation 3 times and still did not comply." ER423. Lieurance's oral statements also indicate that Lieurance arrested Reed for not doing as he was told:

- "You've been instructed by law enforcement to do something, you didn't do it, I'm going to be writing a ticket," Ex.2: 0:49; and

- "He wanted to debate it, too, and I said, well, this is a cut and dry on the line here. You're told by a law enforcement to do something, you didn't do it so you're going to get a ticket." Ex.2: 7:00.

Contrary to Lieurance's assertions that failure to comply is a "cut and dry" crime, "[a] police officer is not a law unto himself; he cannot give an order that has no colorable legal basis and then arrest a person who defies it." *Iacobucci v. Boulter*, 193 F.3d 14,25 (1st Cir. 1999). If an individual's activities are peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights, a police officer lacks the authority to stop them. *Id.*

Reed's purported refusal to comply with an order is not obstruction under Montana law because he had no intention to hinder the operation. *Kalispell*, 2002 MT ¶¶11-13; *Jackson*, 797 F.Supp.2d at 1068. His intention was directly to the contrary - he wanted to observe the operation from a safe distance as it passed along its route. Moreover, Reed believed that he had complied with Tierney's order by moving north. It was highly unlikely that Reed's location 0.6 miles from the

operation's route could interfere with the operation. Lieurance did not have probable cause to arrest Reed for obstruction because Lieurance has failed to meet his legal burden to establish that Reed was "aware" that it was "highly probable" that Reed's presence at Location B would interfere with the operation. *Kalispell*, 2002 MT 78 ¶11; *see also Mackinney*, 69 F.3d at 1008; *Maxwell*, 708 F.3d at 1086; *Wilson*, 337 F.3d at 400-401; *Zellner*, 494 F.3d at 376; *Wilson*, 549 Fed.Appx. at 311.

### 3. The district court erred by granting summary judgment to Lieurance.

The district court erred by granting summary judgment to Lieurance because it failed to view the facts and inferences in the light most favorable to Reed. *Tolan*, 134 S.Ct. at 1868. The district court's factual and legal conclusions were that Reed parked within a corridor "established for the movement of bison" and that "the plaintiff was told to move and did not, he did not move out of the designated corridor" and that therefore "there was probable cause for the arrest. . . . ." ER30-32. The district court's findings of fact and conclusion of law imply that the location of Reed's parked vehicle was within the route for the operation and physically blocked the operation and forced it to stop. As set forth above, this is not an accurate portrayal of the facts.

The facts and inferences in the light most favorable to Reed are that livestock agent Tierney informed Reed that the operation would travel through Location A,

and Tierney asked Reed to move north or south from Location A.  ER162,185B.

Reed then moved out of the operation's route by driving over ½ mile north and

parking on a public gravel road at Location B.  ER176-178,185B.  Reed and

Craddock-Crocker believed that the operation was never going to head north to or

pass through Location B.  ER150,154; Ex.1: 3:24.  Reed and Craddock-Crocker

believed that Location B provided a safe and reasonable observation area for them

to peacefully observe the operation when it would ultimately briefly cross the

highway, heading west to east, over ½ mile south of them.  ER150,154; Ex.1: 3:24.

Reed and Craddock-Crocker believed that they had followed Tierney's order to

move north or south by moving north.  ER176-177; Ex.1: 1:32-2:02,3:08-3:50,4:54-

5:40.  When Lieurance approached Reed to arrest him, Lieurance did not clarify the

order or warn Reed that Reed would be arrested if he did not move further north.

ER179; Ex.1; Ex.2.

Lieurance chose to call the operation and order it to stop while Lieurance

unlawfully arrested and evicted Reed from the area.  ER301.  There was no need for

Lieurance to do this:  Reed "was not in the operation's route and posed no

obstruction to any bison movement."  ER154.  If Lieurance had simply left Reed

alone at Location B, there would have been a 0.6 mile buffer zone between the

operation and Reed when the operation crossed the highway, ER176-177, and the

operation would have successfully traveled along its planned route without any

27

interruption.  ER69-70,153-154.

Thus, Reed was not arrested for actually obstructing the operation or even potentially obstructing the operation in the future; instead, he was arrested because he purportedly did not follow an order to park in a specific area, even though both he and Craddock-Crocker do not recall hearing such a specific order.  The district court did not apply these facts and inferences.  Accordingly, because the district court relied upon disputed facts and facts and inferences that were not viewed in the light most favorable to Reed, the district court did not apply the required summary judgment standard to this case and must be reversed.  *Tolan*, 134 S.Ct. at 1866*; Cortez*, 776 F.3d at 1050; *Furnace*, 705 F.3d at 1026; *Torres*, 648 F.3d at 1123.

Furthermore, in its opinion, the district court cited only the Montana obstruction statute itself, and failed to acknowledge the expressly limited reach of that statute as set forth by the Montana Supreme Court in *Kalispell*.  ER30-32.  The determination of probable cause under a state statute must apply any limiting construction that has been issued by the state's supreme court.  *Beck*, 527 F.3d at 866.  As this Court has stated:  "we must reject [the] contention that the district court was free to ignore the law enunciated by the [state] Supreme Court in [the case] and choose whatever law it felt wisest."  *Gard v. United States*, 594 F.2d 1230,1234 (9th Cir.1979).

The district court also failed to cite any case law at all to support its legal

28

determination on probable cause.  ER30-32.  As this Court has previously held, if

"the district court cites no case law to support its interpretation [of the law], and

ignores the extensive body of law that directly contradicts its reasoning. . . .the

district court's order was clearly erroneous." *U.S. v. Fei Ye*, 436 F.3d 1117,1124

(9th Cir. 2006).

### 4.  Conclusion

For the reasons set forth above, Reed requests that this Court reverse the

district court's ruling on the probable cause claims, and either enter judgment in

Reed's favor or remand and reassign to a different judge for a jury trial on this issue.

## B.  The district court erred by dismissing  Reed's *Monell* claim and denying Reed's motion to amend his Complaint.

### 1.  Standards of review

This Court reviews the district court's grant of summary judgment *de novo*.

*Ford*, 706 F.3d at 1192.  All facts and inferences must be viewed in the light most

favorable to Reed.  *Tolan*, 134 S.Ct. at 1866.

In general, the district court's denial of a motion to amend a complaint is

reviewed for an abuse of discretion.  *Chappel v. Lab. Corp. of Am.*, 232 F.3d

719,725 (9th Cir.2000).  However, a district court only "acts within its discretion to

deny leave to amend when amendment would be futile, when it would cause undue

prejudice to the defendant, or when it is sought in bad faith." *Id.* at 725-726.

"Dismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington Northern, Inc*. 942 F.2d 1467,1472 (9th Cir.1991).

### 2. The Sheriff's Office has failed to implement training and policy regarding citizens' rights to observe and document government conduct.

In *Monell v. Department of Social Services of New York*, the Supreme Court held that plaintiffs may bring suit against local government bodies in 42 U.S.C. §1983 actions.  436 U.S. 658,694 (1978).  The elements for local government liability under §1983 include:  (1) plaintiff has a constitutional right; (2) a person acting under the color of state authority caused a deprivation of that right; (3) a policy or custom of action or inaction was the moving force behind the constitutional violation; and (4) a final policymaker promulgated, deliberately chose, or failed to act with deliberate indifference of the challenged policy or custom.  *Bd. of County Comm'rs of Bryan Co.. v. Brown*, 520 U.S. 397,403-05 (1997).

The failure to supervise and train officers is actionable under §1983.  *City of Canton v. Harris*, 489 U.S. 378,390 (1989); *see also Brown*, 520 U.S. at 409-10. Ninth Circuit authority "places the responsibility for keeping abreast of constitutional developments in criminal law squarely on the shoulders of law enforcement officials."  *Ward v. San Diego County*, 791 F.2d 1329,1332 (9th Cir. 1986).  A law enforcement department in which "officers receive[] little or no

formal training after completing their initial police academy courses" and thus

"lack[] up-to-date direction in many policy procedures" may be liable for failure to

train. *Bordanero v. McLeod*, 871 F.2d 1151,1160 (1st Cir. 1989). The testimony

of a police practices expert is useful in determining whether existing training fails

accepted standards. *See id.* at 1160.

As set forth above and below, Lieurance violated Reed's constitutional rights

by arresting him without probable cause for conduct protected under the First

Amendment, satisfying the first two prongs of the *Monell* test. As set forth below,

the other two prongs of the *Monell* test are also met in this case.

### a. The policy or custom of action or inaction was the moving force behind the constitutional violations.

Lieurance testified that he has not received training in (a) the right of citizens

to videotape in public places, (b) the right of citizens to be present in public places

that they choose, (c) the right of a citizen to question a law enforcement officer, (d)

a citizen's right to ignore a request by a law enforcement officer, (e) what

constitutes free speech, (f) the First Amendment right of the press to gather or

citizens to gather information, or (g) the right to protest government conduct.

ER275-278. Lieurance also does not remember receiving any training on Montana

Supreme Court cases that define the crime of obstruction, and does not know

whether an individual could commit the crime of obstruction accidentally. ER279.

The officers designated Undersheriff Springer as their 30(b)(6) representative for the issue of training. Springer testified that between September 18, 2006, when Lieurance was hired, and May 23, 2012:

- "There is nothing - there is no documented training on freedom of speech training that I'm aware of." ER193.

- "I don't recall, you know, having any specific training on freedom of assembly." ER194-195.

- Regarding freedom of the press: "I don't recall us having any specific training on that." ER195.

- Regarding the right of citizens to assemble on public land: "I don't believe we've had any specific training to that." ER195.

- Regarding the right of a citizen to observe or film public employees while they're in the line of duty: "Training, no, we have not trained." ER196.

There is also no such training in legal updates, ER197, or the field training manual, ER190.

Reed hired a police practices expert to determine whether existing training fails accepted law enforcement standards. *See Bordanero*, 871 F.2d at 1160. Reed's expert, Chief Longo, finds that the officers' lack of training on these fundamental issues is inconsistent with generally accepted police practices. ER245. Chief Longo finds that First Amendment training is especially necessary for Gallatin County Sheriff's deputies due to the department's recurring interactions with Campaign volunteers attempting to record government conduct. ER229. The

32

officers did not provide any contrary expert testimony to refute Longo's expert conclusions.

The unconstitutional failure to train, failure to supervise, and/or acquiescence in a practice of arresting citizens for exercising constitutional rights were the moving forces behind Lieurance's deprivations of Reed's constitutional rights.   If Lieurance had been properly trained and supervised on the constitutional limits of his authority, Lieurance would not have arrested Reed without probable cause for protected First Amendment activities on May 23, 2012.

### b. The Sheriff promulgated, deliberately chose, or failed to act with deliberate indifference to the challenged policy or custom.

Deliberate indifference is an objective, not subjective, standard, which is "premised on obviousness or constructive notice." *Farmer v. Brennan*, 511 U.S. 825, 841 (1994).   The Supreme Court holds that "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference'. . . ." *Brown*, 520 U.S. at 409-10.   In this case, Chief Longo emphasizes that there is such a "recurring situation" here, namely the recurring presence of citizens observing and documenting buffalo herding operations around Yellowstone National Park. ER229,241.   A failure to implement a training program for deputies that informs

33

them of the constitutional rights repeatedly implicated in this recurring situation

amounts to a "failure to equip law enforcement officers with specific tools to handle

recurring situations." *Brown*, 520 U.S. at 409-10; *see also Canton*, 489 U.S. at

390.

The deliberate indifference in this case is further demonstrated by the

Sheriff's failure to track when obstruction citations are dismissed, despite actual or

constructive knowledge that obstruction citations issued to Campaign volunteers

have been dismissed multiple times. ER257,310B-310D. Regarding Reed's

dismissed obstruction charge, Lieurance received no discipline and testified that

there is no harm to him from issuing a citation that is later dismissed.

ER304,310,313. Although the Sheriff is aware that obstruction citations are being

dismissed in this situation, ER310B-310D, he has still not ordered any training

specific to this issue, ER198. Collectively, these facts demonstrate deliberate

indifference to citizens' constitutional rights in this case.

### 3. The district court erred by dismissing Reed's *Monell* claim and denying leave to amend his Complaint.

The district court dismissed Reed's *Monell* claim because it held that the

allegations in Reed's complaint "are not in accord with the factual specificity

of pleading requirements required by *Iqbal/Twombly* and their progeny." ER34.

However, in this case, the officers never filed a motion to dismiss Reed's *Monell*

claim on those grounds. While a trial court may *sua sponte* dismiss claims, it first

"must give notice of its intention to dismiss and afford plaintiffs an opportunity to at

least submit a written memorandum in opposition to such motion." *Lee v. Los

Angeles*, 250 F.3d 668,683 n.7 (9th Cir.2001)(citations and internal punctuation

omitted). In this case, the district court did not provide Reed with notice and an

opportunity to provide a written memorandum addressing the application of

*Iqbal/Twombly* to this case prior to the district court's dismissal of the claim. Thus,

the dismissal was erroneous. *Id.*

Furthermore, the Rules of Civil Procedure state: "A party may *move—at any

time, even after judgment* — to amend the pleadings to conform them to the

evidence and to raise an unpleaded issue." FRCP15 (emphasis added). Therefore,

after the district court's July 2014 ruling, Reed moved to amend his Complaint to

add more specificity to his *Monell* claim to address the district court's concerns

regarding compliance with *Iqbal/Twombley*. The district court denied the motion on

the grounds that the deadline for amendment of pleadings had already passed.

ER21-23.

This Court has "previously criticized a trial judge who seemed 'above all to

be determined not to disturb [the court's] trial schedule.'" *U.S. v. Nguyen*, 262 F.3d

998,1003 (9th Cir. 2001)(citation omitted). Additionally, "a district court should

grant leave to amend even if no request to amend the pleading was made, unless it

determines that the pleading could not possibly be cured by the allegation of other facts.'" *Lacey v. Maricopa Cnty*, 693 F.3d 896,926 (9th Cir.2012)(*en banc*) (emphasis added). Moreover, in *Ashcroft v. Iqbal*, the Supreme Court acknowledged that dismissal under *Iqbal* does not foreclose the filing of an amended complaint. 556 U.S. 662,687 (2009). To the contrary, "[d]ismissal without leave to amend is improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich,* 942 F.2d at 1472.

In *Foman v. Davis*, the Supreme Court set forth multiple factors a district court should consider in deciding whether to grant leave to amend. 371 U.S. 178,182 (1962). Additionally, in this Court, [a]bsent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc*. 316 F.3d 1048,1052 (9th Cir.2003)(citations omitted).

In this case, the district court failed to make a finding that the Complaint could not be saved by any amendment, failed to address any of the *Foman* factors, and failed to address the liberal amendment policy adopted by this Court and FRCP 15. ER18-23 "Appellate review is a particularly difficult process when there is nothing to review." *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078,1081 (9th Cir.2000).

**4. The district court failed to comply with the summary judgment standard.**

Although the district court relied upon *Iqbal/Twombly* for its dismissal of Reed's *Monell* claim, the district court also addressed matters outside the pleadings, which thus requires application of the summary judgment standard. ER34 (referencing Sheriff Gootkin's testimony, unspecified evidence, and expert report); FRCP 12(d). The testimony of both Lieurance and the 30(b)(6) officer as it relates to lack of training, as discussed above, in addition to Reed's unrefuted expert testimony on the generally accepted police practices for training, as also discussed above, provide evidentiary support for this claim. The district court's ruling on this claim ignores the former and discredits the latter. ER34. Therefore, the district court violated the summary judgment standard by ignoring contrary evidence and failing to view the facts in the light most favorable to Reed. *Tolan*, 134 S.Ct. at 1866; ER34-35.

**5. Conclusion**

For the reasons discussed above, Reed requests that this Court reverse the district court, and either enter judgment in Reed's favor, or remand and reassign to a different judge for either a jury trial, amendment of the Complaint, or at least an opportunity to address *Iqbal/Twombley* in briefing.

## C. The district court erred in excluding Reed's police practices expert.

The trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *Sullivan v. U.S. Dep't of Navy*, 365 F.3d 827,832 (9th Cir.2004). The court abuses its discretion if it does not follow the legal standard set forth in the *Kumho-Daubert* criteria. *Id.* at 833; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). "Rejection of expert testimony is the exception rather than the rule." *Groves v. Croft*, 2011 WL 5509028 at *6 (D.Mont.2011) (*quoting* FRE 702 Advisory Notes).

"Police practice experts have become common in cases involving allegations of police misconduct." *See e.g., Bates v. King County*, 2007 WL 1412889 *2 (W.D. Wash. 2007) (*citing Larez v. City of Los Angeles*, 946 F.2d 630,635 (9th Cir.1991)). This Court explained the rationale in *Davis v. Mason County*:

> Mason County objected to plaintiffs' police expert, Donald Van Blaricom, because he testified that Sheriff Stairs was reckless in his failure to adequately train his deputies, and that there was a causal link between this recklessness and plaintiffs' injuries. They contend that this was improper opinion testimony on a question of law.

> This argument is without merit. Fed.R.Evid. 704 allows expert witnesses to express an opinion on an ultimate issue to be decided by the jury. []. Moreover, Fed.R.Evid. 702 permits expert testimony comparing conduct of parties to the industry standard.

927 F.2d 1473,1484 -1485 (9th Cir.1991), *superceded by statute on other*

*grounds*.

Pursuant to this Court's precedent, Reed retained Chief Longo as his police practices expert for the purpose of providing expert testimony "comparing conduct of parties to the industry standard." *Id.* A typical juror would not be expected to be familiar with police training standards; it is an area outside the experience of a typical citizen, therefore expert testimony on this issue would be helpful and necessary. FRE 702. The officers did not disclose an expert, and thus provided no expert rebuttal to Chief Longo's findings on generally accepted police training standards.

Chief Longo provides his opinions "with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision," and his opinions are "based upon [his] education, specialized experience, training and knowledge of police practices as well as [his] continued research and work with law enforcement nationally." ER208-209. Chief Longo's report includes his opinions and bases for his opinions. ER208-267.

The test for a trial court to apply is whether the expert testimony has a reliable foundation and is relevant. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Pyramid Technologies, Inc. v. Hartford Cas.*

39

*Ins. Co.*, 752 F.3d 807,813 (9th Cir.2014)(citation omitted). The district court did not dispute Chief Longo's experience and training in his discipline, or dispute that Chief Longo's expert opinions were based upon that knowledge and experience. The district court also did not find that Chief Longo's findings were irrelevant to *Monell* liability. Nonetheless, the district court excluded Chief Longo's testimony. The district court's failure to apply the appropriate legal test for expert exclusion renders its decision an abuse of discretion. *Sullivan*, 365 F.3d at 833.

Instead of applying the legal test for expert exclusion, the district court repeatedly implied that Chief Longo could not consider facts that the district court might not admit at trial, or that might not be proven at trial. ER41-45. The district court's ruling in this regard conflicts with FRE 703's express statement that facts and data "need not be admissible for the opinion to be admitted." FRE 703.

Likewise, the district court's general statements that imply that Chief Longo cannot discuss issues in legal terms are also not supported by the rules. ER44-45. FRE 704 explicitly states: "An opinion is not objectionable just because it embraces an ultimate issue." Furthermore, an expert "may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998,1017 (9th

Cir.2004) (citation omitted).

In its exclusion order, the district court provided only two actual citations to Chief Longo's report.  The district court disapproved of Paragraphs 18 through 29 in the expert's report because the court believed the paragraphs "are not admitted in the pleadings, some are only partially characterized accurately, and some are, in the view of the Court, highly editorialized or spun in their manner of presentation." ER42.   Contrary to the district court's representations, Paragraphs 18 through 29 are simply recitations of the events that occurred leading up to and during Reed's arrest, and have been discussed at length throughout this brief.  ER210-212.

The district court's only other citation to Chief Longo's report was to Paragraph 165, which the district court characterized as "disparaging comments on the conduct of non-parties," and a "plainly over the top" "criticism of the county prosecutor."  ER43-44.  To the contrary, paragraph 165 is a critique of the Sheriff's Office, not the county prosecutor; it is a statement that by repeatedly dismissing the obstruction citations issued by deputies, the prosecutor is providing actual or constructive notice to the Sheriff's Office that the Sheriff's Office is engaged in a pattern of issuing obstruction citations in a manner that does not comply with the law.  ER238.

Other than the two citations addressed and debunked above, the district court did not provide any other citation to the report to support its ruling to exclude Chief

Longo's report. This Court holds: "Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert." *Kennedy v. Collagen Corp.*, 161 F.3d 1226,1230 (9th Cir.1998). The district court's exclusion of Reed's expert was an abuse of discretion.

**D.  The district court erred in granting judgment as a matter of law.**

Reed's free speech, press, and assembly and retaliation claims went to trial before the district court. After Reed had presented his case in chief, the district court granted judgment as a matter of law to Lieurance on all three claims.

**1.  Standard of review**

"[T]he standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same." *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133,150 (2000)(citations and internal quotation marks omitted). Thus, this Court reviews *de novo* a district court order granting judgment as a matter of law under Rule 50. *Torres v. City of Los Angeles*, 548 F.3d 1197,1205 (9th Cir. 2008)(citation omitted)(reversing judgment as a matter of law in §1983 case); *see also Velazquez,* 2015 WL 4256899 *9 (same).

"The evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde v. County of Riverside*, 204 F.3d 947,959 (9th Cir.2000) (reversing

judgment as a matter of law in §1983 case). The district court "may not make credibility determinations or weigh the evidence" because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 151.

Additionally, a trial court may not grant a Rule 50 motion on grounds that were not raised by the moving party because the nonmoving party "must have a meaningful opportunity to reply and must not be sandbagged by a decision on grounds not properly noticed." *Summers v. Delta Air Lines*, 508 F.3d 923,927-28 (9th Cir.2007). Moreover, prior to granting a Rule 50 motion, "the trial court has an overlapping responsibility to inform the non-moving party of deficiencies in its proof and to afford that party an opportunity to correct any such deficiency." *Waters v. Young*, 100 F.3d 1437,1441 (9th Cir.1996). "These obligations reflect a major purpose of the motion for judgment as a matter of law, which is to call the claimed deficiency in the evidence to the attention of the court and to opposing counsel at a time when the opposing party is still in a position to correct the deficit." *Id*. (citations and internal quotation marks omitted). Compliance with these obligations under Rule 50 "is mandatory." *Id* at 1442.

### 2. Reed's claims at trial

#### a. Deputy Lieurance unreasonably restricted the exercise of

**Reed's rights.**

Under the Montana and U.S. Constitutions, Montanans are guaranteed the rights to freedom of assembly, speech, expression, and press. U.S. Const. amend. I; Mont. Const. art. II, §§6,7.  "These expressly guaranteed freedoms share a common core purpose of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers. v. Virginia*, 448 U.S. 555,575 (1980).  There is a "First Amendment right to 'receive information and ideas[.]'" *Kleindienst v. Mandel*, 408 U.S. 753,762 (1972). "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest . . . ." *Glik*, 655 F.3d at 82-83 (citations and internal quotations omitted).

Thus, the First Amendment "prohibit[s] [the] government from limiting the stock of information from which members of the public may draw." *First National Bank of Boston v. Bellotti*, 435 U.S. 765,783 (1978).  In particular, "[t]he First Amendment protects the right to gather information about what public officials do on public property . . . ." *Smith v. City of Cumming*, 212 F.3d 1332,1333 (11th Cir. 2000); *see also Fordyce v. City of Seattle*, 55 F.3d 436,439 (9th Cir.1995) (recognizing a "First Amendment right to film matters of public interest"); *ACLU v. Alvarez*, 679 F.3d 583,599 (7th Cir. 2012).  The DOJ recently filed two statements of interest in similar cases, emphasizing that law enforcement officers may not

interfere with the rights of the public to gather and disseminate information about public officials performing duties in public. ER364-376,447-464.

"The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental." *De Jonge v. State of Oregon*, 299 U.S. 353,364 (1937). "People assemble in public places not only to speak or to take action, but also to listen, observe, and learn; indeed, they may assemble for any lawful purpose []." *Richmond Newspapers*, 448 U.S. 578 (citation and internal punctuation omitted). Closely related to assembly are other constitutional rights to "freedom of movement," the right "to remain in a public place of [one's] choice," and the right to "to move 'to whatsoever place one's own inclination may direct.'" *City of Chicago v. Morales*, 527 U.S. 41,54 (1999).

"[M]embers of the public retain strong free speech rights when they venture into public streets and parks . . . . government entities are strictly limited in their ability to regulate private speech in such 'traditional public fora.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460,469 (2009). A public street is "the archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474,480 (1988). Thus, a "peaceful recording . . . in a public space that does not interfere with the police officers' performance of their duties is not reasonably subject to limitation." *Glik*, 655 F.3d at 84.

While the government may impose reasonable time, place, and manner

restrictions on First Amendment rights, such restrictions are only reasonable if they (1) are not content-based, (2) are narrowly-tailored to serve a significant government interest, and (3) leave ample alternative channels for communication of the information.  *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892,897 (9th Cir. 2008).  "The failure to satisfy any single prong of this test invalidates the [restriction]."  *Kuba v. 1-A Agr. Ass'n* , 387 F.3d 850,858 (9th Cir. 2004)(citation omitted).

In this case, the restriction of Reed's rights was unreasonable because it was not narrowly-tailored to serve a significant government interest.  *Id.*  The inquiry here is whether the restriction imposed on Reed in this case – i.e. the government's refusal to allow Reed to observe the operation from his chosen location 0.60 miles from the operation's route, and the government's imposition of a 0.90 miles buffer zone instead – was narrowly-tailored to serve a significant government interest in this case.   To be "narrowly-tailored" a restriction must "(1) promote a substantial government interest that would be achieved less effectively absent the regulation, and (2) must not burden substantially more speech than is necessary to further the government's legitimate interests." *Kuba*, 387 F.3d at 861 (citations and internal punctuation omitted).

The Supreme Court recently struck down a buffer zone because it was not narrowly-tailored.  *McCullen v. Coakley*, 134 S. Ct. 2518,2538-2541 (2014).  In

*McCullen*, the Court held: "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540.

In this case the restriction Lieurance imposed on Reed was not "narrowly-tailored" because Reed's peaceful presence 0.60 miles from the herding route would not have affected the operation in any way. ER58,80,101-102,409. Thus, the operation would not have "be[en] achieved less effectively" if Reed was present at Location B, *Kuba*, 387 F.3d at 861, nor would allowing Reed to remain at Location B result in a "fail[ure] to achieve" the herding operation, *McCullen*, 134 S.Ct. at 2538-2540. Likewise, the restriction burdened more speech than necessary because Reed could not observe the crossing from the 0.90 mile buffer zone, and Reed's peaceful presence observing the operation from 0.60 miles away would not have affected the operation at all, ER80, thus there was no necessity to force him to leave that location. *Kuba*, 387 F.3d at 861; *Dietrich* 548 F.3d at 894-895; *see also Gathright v. City of Portland*, 439 F.3d 573,578 (9th Cir. 2006)(rejecting notion of "eviction from legitimately occupied public space").

Furthermore, there was no significant government interest in excluding Reed from the area. It is black letter law that "[m]ere speculation of harm does not constitute a compelling state interest." *Consolidated Edison Co. of New York, Inc.*

47

*v. Public Service Commission of New York,* 447 U.S. 530,543 (1980). Thus,

"merely invoking interests in regulating traffic . . . is insufficient. []. The government

must also show that the proposed communicative activity endangers those

interests." *Kuba*, 387 F.3d at 859. It is the government's burden to show that there

is objective evidence supporting an alleged safety or congestion issue, other than

mere speculation. *Id.*

In this case, any safety issue was purely speculative. Lieurance admitted the

risk was speculative because the buffalo weren't there. ER120. Lieurance admitted

that Reed was not physically blocking any buffalo, and Lieurance did not see Reed

scaring any horses or scaring any buffalo. ER117. Lieurance did not even know

where the operation was or ask anyone where it was. ER123. Lieurance testified

that because he did not know the route for the day, he would not be able to say

whether Reed's vehicle was physically blocking the route because he did not know

where the route was. ER116. Lieurance admitted that he did know that the

operation was headed west to east and he never saw it head north on Highway 191.

ER116.

In his police report, the only potential safety hazards Lieurance could

speculate about in general for herding operations would be unsafe conditions for

riders with the herding operation, a public citizen being run over by a buffalo, or

horses or buffalo being scared by citizens. ER418. At trial, Lieurance admitted that

48

his discussion of potential safety issues in his police report was based on something that happened on some other day other than May 23, 2012; those issues did not occur with Reed on the date of Reed's arrest.  ER121.

The government has provided "little to no factual justification" for its arbitrary distinction that a 0.60 mile buffer zone is so unsafe when it comes to observing buffalo herding operations that it requires arrest and eviction, but a 0.90 mile buffer zone is perfectly safe.  *See Kuba*, 387 F.3d at 859. In fact, the evidence that different law enforcement officers allowed different members of the public to stand within 50 yards of the same operation later that day to observe and photograph the buffalo undermines any implication that a 0.90 mile buffer zone from the operation is required for public safety.  ER64-65; Ex.2:14:13.

Two additional district court opinions are instructive on this issue.   In *Cuviello v. Oakland*, a district court rejected the defendants' speculation and bald assertions of risk of harm to people and animals related to a plaintiff's attempt to observe the treatment of circus animals.  2007 WL 2349325, at *6-7 (N.D.Cal.2007).  Citing *Kuba*, the court found that merely invoking the interest of safety was insufficient, and there was a lack of evidence that the plaintiff would actually exacerbate any safety issue.  *Id.*  The court ultimately held that the buffer zone was "needlessly vast" and "not justified by experience or evidence."  *Id.*   As applied to this case, the 0.90 mile buffer zone imposed on Reed was also

49

"needlessly vast," *id.*, because the evidence indicates that only a 50 yard buffer zone is necessary for the safety of the buffalo, horses, and riders, ER64-65; Ex.12: 14:13.

Similarly, in *Robinson v. Fetterman*, a district court found that an individual filming police conduct on a highway was not posing any safety hazard or interfering at his location 20 to 30 feet from the officers on the highway. 378 F. Supp. 2d 534,543 (E.D.Pa.2005). Certainly if a buffer zone of 20 to 30 feet from an officer's operation on the highway is reasonable, then Reed's distance of 0.60 miles from the highway crossing was eminently reasonable. ER58,101-102,409.

In summary judgment briefing, Lieurance relied on one district court opinion: *Leigh v. Salazar*, 954 F.Supp.2d 1090 (D.Nev.2013). In *Leigh*, the restrictions at issue were two observation areas that required a 100 foot or 300 foot buffer zone from a government herding operation for wild horses. *Id.* at 1094. In contrast, in this case, the government would not even allow Reed to be 0.60 miles from the operation, which is significantly more restrictive than the 300 foot buffer zone in *Leigh. Id.*; ER58,101-102,409. Moreover, unlike in *Leigh*, in this case Lieurance's 0.90 mile buffer zone did not provide an "observation area" at all, but instead completely prevented Reed from viewing the operation. ER62.

Furthermore, a paramount safety concern at issue in *Leigh* was that "the Silver King Gather used helicopters to drive the horses and that the use of

50

helicopters involves unique and inherent safety concerns." 954 F.Supp.2d at 1102. Unlike *Leigh*, in this case there was no helicopter in use to drive buffalo on May 23, 2012 due to the temporary restraining order a different district court judge had issued against such helicopter use. ER425.

In sum, Lieurance failed to meet his burden to establish that the 0.90 mile buffer zone was narrowly-tailored because he failed to provide objective evidence that Reed's communicative activity at his chosen location 0.60 miles from the operation route actually endangered significant non-speculative government interests, and that Reed's eviction from that area was necessary for the herding operation to continue as planned. *See Kuba*, 387 F.3d at 859.

### b. Deputy Lieurance violated Reed's right to exercise his rights without government retaliation.

An "individual has a right to be free from police action motivated by retaliatory animus [even if] there was probable cause" for arrest. *Ford*, 706 F.3d at 1193 (citation and internal punctuation omitted). The Supreme Court holds that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451,461 (1987). Therefore, police officers do not have "unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Id.* at 465. In particular, "criticism of the police for what [one] perceive[s] to be an unlawful . . . traffic stop falls squarely

within the protective umbrella of the First Amendment and any action to punish or
deter such speech [] is categorically prohibited by the Constitution." *Ford,* 706
F.3d at 1193 (*citing Duran*, 904 F.2d at 1378). "Surely, one is not to be punished
for nonprovocatively voicing his objection to what he obviously felt was a highly
questionable detention by a police officer." *Norwell v. City of Cincinnati, Ohio*,
414 U.S. 1416 (1973).

"In order to establish a claim of retaliation in violation of the First
Amendment, [the] evidence must demonstrate that the officers' conduct would chill
a person of ordinary firmness from future First Amendment activity." *Ford,* 706
F.3d at 1193 (citation omitted). Additionally, "the officers' desire to chill [the
plaintiff's] speech was a but-for cause of their allegedly unlawful conduct." *Id*.
(citation omitted).

In *Ford*, the plaintiff criticized the officer for making a traffic stop and the
officer made the following statements in response:

> (1) "Stop running the mouth and listen"; (2) "If you talk over me, you
> are going to go to jail, sir. Do not talk over me"; (3) "If you cooperate,
> I may let you go with a ticket today. If you run your mouth, I will book
> you in jail for it. Yes, I will, and I will tow your car"; (4) "If you
> cooperate and shut your mouth, I'll give you a ticket and you can go."

706 F.3d at 1190-1191.

Prior to threatening to take Reed to jail in this case, Lieurance had the
following conversation with livestock agent Tierney:

52

Tierney:  "He sat there and wanted to debate?"

Lieurance:  "Yeah. He wanted to debate it, too, and I said, well, this is a cut and dry line here. You're told by a law enforcement to do something, you didn't do it so you're going to get a ticket."

Tierney:  "There you go."

Lieurance:  "I'll explain to him when I give it to him that if he continues he'll go to Bozeman.[2]"

Tierney:  "There you go."

Ex.2: 7:00.

Subsequently, when Reed continued to question the legal basis for his arrest, Lieurance pointed north and stated: "I'm not gonna argue.  Either we get in the car and we go now, or both of you will be going to jail. That's the bottom line."  Ex.1: 17:50.  Lieurance testified that the intended impact of this statement was that Reed would leave the area, and it worked.  ER126-127.

Lieurance's threat to take Reed to jail successfully deterred and chilled Reed from continuing to assert his rights that day; Reed ultimately left the area because he was afraid of going to jail.  ER62,126.  This threat of jail will continue to deter and chill people of ordinary firmness from attempting to question an unlawful order and assert rights to peacefully observe government action from a safe location of their own choice in the future.  *See Ford*, 706 F.3d at 1193.  Lieurance's jail threat was

---

[2]"Bozeman" is the location of the county jail.

primarily motivated by a desire to cause Reed to stop "debat[ing]" him and leave the area. Ex.2: 7:00; ER126-127. Thus, the desire to have a chilling effect on Reed was a but-for cause of Lieurance's threat to take Reed to jail. *See Ford*, 706 F.3d at 1193.

### 3. The district court erred by granting judgment as a matter of law.

#### a. The district court violated basic premises of Rule 50 and its advisory comments.

This Court holds that "a major purpose of the motion for judgment as a matter of law [] is to call the claimed deficiency in the evidence to the attention of the court *and to opposing counsel* at a time when the opposing party is still in a position to correct the deficit." *Waters*, 100 F.3d at 1441 (citation and internal quotation marks omitted)(emphasis in original). Therefore, this Court further holds: "Federal Rule of Civil Procedure 50 requires district courts to apprise parties of the deficiencies in their proof, and to give them an opportunity to present further evidence on the dispositive facts, before granting judgment as a matter of law against them." *Id.* at 1442. "Compliance with the Rule, including the fulfilling by the court of its obligations as explained in the Advisory Committee note, is mandatory." *Id.* Furthermore, a district court may not grant a Rule 50 motion on grounds not raised by the moving party. *Summers*, 508 F.3d at 927-28 (reversing where district court granted Rule 50 motion on grounds not raised by the defendant).

In this case, Lieurance's counsel made three arguments in his Rule 50 motion:

(1) Deputy Lieurance is not the proper defendant, ER138; (2) the arrest threat was not intended to chill Reed's rights, ER138; and (3) argument regarding punitive damages, ER138-139. Lieurance's counsel then stated: "So that would be the extent of my Rule 50 motion." ER139.

In the court's ruling it made the following three findings: (1) the First Amendment restriction was reasonable as a matter of law, ER10; (2) there was no First Amendment retaliation as a matter of law, ER13-14; and (3) Lieurance was entitled to qualified immunity, ER14. Accordingly, the district court's ruling did not address the same issues presented by Lieurance's motion. *See Summers*, 508 F.3d at 927-28. In particular, prior to its ruling, the district court did not provide notice to Reed of its intention to rule on whether the First Amendment restriction was reasonable as a matter of law, or its intention to rule on the issue of qualified immunity. Regarding the latter, even the district court admitted that it was an "issue which no counsel has raised or briefed in this matter . . . ." ER14.

Furthermore, regarding all three issues ruled on by the district court, Reed "was neither apprised of the alleged deficiencies in [his] proof nor given the opportunity to cure such deficiencies" prior to the district court's Rule 50 ruling. *See Summers*, 508 F.3d at 927-28. As both of these circumstances are impermissible under Rule 50 and this Court's precedent, the district court's Rule 50 judgment on all three of Reed's claims at trial must be reversed. *Id.*

**b. The district court's decision is premised on impermissible factual findings.**

In a Rule 50 ruling, "[t]he evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in favor of that party. If conflicting inferences may be drawn from the facts, the case must go to the jury." *LaLonde*, 204 F.3d at 959. Additionally, the district court "may not make credibility determinations or weigh the evidence" because those "are jury functions, not those of a judge." *Reeves*, 530 U.S. at 151. More specifically, the district court may not rely on officer testimony and decide that a plaintiff's description of the events is inaccurate. *LaLonde*, 204 F.3d at 959; *Velazquez*, 2015 WL 4256899 *9.

The district court's Rule 50 ruling is premised upon numerous impermissible factual findings that ignore contrary testimony, weigh evidence, make credibility assessments, accept officer testimony and discredit Reed and Craddock-Crocker's description of events, and fail to view facts and inferences in the light most favorable to Reed. ER1-14. For example, the district court ruled that the buffalo were not subject to control, ER4, but livestock agent Cunningham testified that the herders successfully herded the buffalo from Madison Arm Road to 7-Mile Bridge inside Yellowstone Park. ER105-106. The district court ruled that the record did not establish where the highway crossing occurred, ER6-7, but Deputy Hernandez testified that he followed the operation as it crossed the highway and headed west

56

along Conservation Lane, ER100-102.[3]  The district court ruled that Reed was directly ordered to park behind a traffic barrier, ER7, but there were no traffic barriers in place at the relevant time, and Reed and Craddock-Crocker testified that they did not recall hearing such an instruction, ER55,59,69,73,78-80,90,123-125, Ex.1: 1:32-2:02,3:08-3:50,4:54-5:40.

Perhaps most troubling, the district court ruled that there was "undisputed testimony in this record that [Reed's] vehicle's presence was, by the testimony, an interference with the movement of the haze operation; that it presented a danger to the safety of the operation in general, at least a potential danger to persons who were in or near the parked vehicle . . . ." ER7.  To the contrary, Reed's vehicle was over ½ mile north of the operation's route and it did not block any buffalo, or scare any horses or riders, at any time that day, and Lieurance admitted that the safety issue was speculative because there were no buffalo there.  Ex.1; ER108,116,117, 120.  Lieurance further testified that the discussion of potential safety issues in his police report was based on something that happened on some other day other than May 23, 2012; those issues did not occur with Reed on the date of Reed's arrest. ER121.  Likewise, the district court's ruling that Reed's vehicle caused a shutdown

---

[3]The Rosin Declaration from Reed's criminal case confirms Hernandez's testimony.  ER408-409.  Reed was prepared to offer this sworn declaration as evidence (Proposed Trial Exhibit 7) under the residual hearsay exception, FRE 807, if no eyewitness could recall the operation's route that day.

of the highway has no basis in fact. ER8. The government planned to shut down highway traffic to allow the buffalo to cross; Reed had nothing to do with that plan. *See e.g.* ER104.

Moreover, the district court chose to disregard the fact that other law enforcement officers allowed other members of the public to stand and document the operation from within 50 yards on the same day. ER10,64-65; Ex.12: 14:13. The district court also discredited Reed's testimony that he would not have been able to adequately observe the operation from the south side of Conservation Lane. ER10,75; *see also* ER128-129.

Finally, the district court's finding on the retaliation claim was premised on its finding that Reed "did not have the right to be there, by the Court's ruling, and if he did not have the right to be there, he has no basis for complaining that he is being obliged to leave there." ER14. This finding is contrary to law: the First Amendment right to question an unlawful arrest applies regardless of whether there is probable cause for arrest. *Duran*, 904 F.2d at 1378; *Ford*, 706 F.3d at 1193,1196-1197.

In addition to the court's impermissible factual findings, the district court admitted that it was applying a presumption "that the law has been obeyed" by Deputy Lieurance. ER6. An express presumption that Lieurance complied with the law does not comport with the Rule 50 mandate to view the facts and inferences in

58

the light most favorable to Reed. *LaLonde*, 204 F.3d at 959; *Velazquez*, 2015 WL 4256899 *9.

Furthermore, as this Court has previously held, if "the district court cites no case law to support its interpretation [of the law], and ignores the extensive body of law that directly contradicts its reasoning. . . .the district court's order was clearly erroneous." *Fei Ye*, 436 F.3d at 1124. In its Rule 50 ruling, the district court failed to cite a single case to support its interpretation of the law, and it ignored every case to the contrary. This is reversible error. *Id.*

Finally, the district court also ignored key legal arguments presented by Reed. *See LaLonde*, 204 F.3d at 960 (reversing district court for ruling that ignored some of plaintiff's claims). Regarding the First Amendment restriction claim, the district court failed to address Reed's argument that the restriction was not narrowly-tailored. The district court does not address the test to determine whether a restriction is narrowly-tailored, or cite or discuss any of the relevant case law on that issue, as set forth above. Regarding Reed's First Amendment retaliation claim, the district court ignores the law that discusses the constitutional rights to question law enforcement, and be free from retaliatory action for engaging in such questioning, as set forth above.

### 4. Conclusion

For the reasons set forth above, Reed requests that this Court reverse the

district court's judgment as a matter of law and either enter judgment in Reed's favor or remand and reassign to a different judge so that Reed's claims may be heard by a jury.

## VIII.  CONCLUSION

For all of the reasons set forth above, Reed respectfully requests that this Court reverse the district court, and either enter judgment in Reed's favor, or remand for a jury trial on all claims and reassign to a different judge within the District of Montana.  "Reassignment is warranted here because the judge may 'have substantial difficulty in putting out of his ... mind previously expressed views or findings determined to be erroneous.'" *Velazquez*, 2015 WL 4256899 *17 (citation omitted); *see also U.S. v. Paul*, 561 F.3d 970,975 (9th Cir.2009).

Respectfully submitted this 17th Day of July, 2015.

/s/*Rebecca K. Smith*
REBECCA K. SMITH
Public Interest Defense Center, P.C.

TIMOTHY BECHTOLD
Bechtold Law Firm, PLLC

Attorneys for Appellant

## STATEMENT OF RELATED CASES

Appellant is not aware of any related cases pending before this Court.

CERTIFICATE OF COMPLIANCE

I certify that pursuant to Fed. R. App. P. 32 (a)(7)(C) and Ninth Circuit Rule

32-1, the attached opening brief is proportionately spaced, has a typeface of 14

points or more and contains 14,000 words excluding the cover, table of contents,

table of authorities, statement of related cases, certificates of compliance and

service, signature blocks, and addendum.

Respectfully submitted this 17th Day of July, 2015.

> /s/Rebecca K. Smith
> REBECCA K. SMITH
> Public Interest Defense Center, P.C.
> TIMOTHY BECHTOLD
> Bechtold Law Firm, PLLC
> Attorneys for Appellant

CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2015, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Ninth

Circuit by using the appellate CM/ECF system. All participants in the case are

registered CM/ECF users and service will be accomplished by the appellate

CM/ECF system.

> /s/ Rebecca K. Smith
> Rebecca K. Smith
> PUBLIC INTEREST DEFENSE CENTER, P.C.
> Timothy M. Bechtold
> BECHTOLD LAW FIRM, PLLC
> Attorneys for Appellant

<u>ADDENDUM</u>

## STATUTES

**42 U.S.C. §1983**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**Mont. Code Ann. §45-1-104 (2)**

(2) No conduct constitutes an offense unless it is described as an offense in this code or in another statute of this state. However, this provision does not affect the power of a court to punish for contempt or to employ any sanction authorized by law for the enforcement of an order, civil judgment, or decree.

**Mont. Code Ann. §45-7-302 (1),(3)**

(1) A person commits the offense of obstructing a peace officer or public servant if the person knowingly obstructs, impairs, or hinders the enforcement of the criminal law, the preservation of the peace, or the performance of a governmental function, including service of process.

. . .

(3) A person convicted of the offense of obstructing a peace officer or other public servant, including a person serving process, shall be fined not to exceed $500 or be imprisoned in the county jail for a term not to exceed 6 months, or both.

<u>CONSTITUTIONAL PROVISIONS</u>

**Mont. Const. art. II, §§6,7**

Section 6. Freedom of assembly. The people shall have the right peaceably to assemble, petition for redress or peaceably protest governmental action.

Section 7. Freedom of speech, expression, and press. No law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty. In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

**Mont. Const. art. II,§§10,11**

Section 10. Right of privacy. The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Section 11. Searches and seizures. The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

**U.S. Const. amend. I**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**U.S. Const. amend. IV**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.